**MOSKIN v. JOHNSON.**

United States District Court
S. D. New York.

June 11, 1953.

Hays, St. John, Abramson & Schulman, New York City, Arthur Garfield Hays and Morris Shilensky, New York City, for plaintiff.

Myles J. Lane, Henry L. Glenn, New York City, for defendant.

BONDY, District Judge.

This is an action for the refund of taxes together with interest and penalties amounting to $251,525.12 paid by

the plaintiff Morris Moskin to the defendant, Collector of Internal Revenue. The plaintiff contends that dividends paid on 10,000 shares of Moskin Stores, Inc. in the years 1935 to 1941 inclusive constituted income of a trust established by him for the benefit of his three children, and therefore was erroneously held to be taxable to him.

The Government contends that the circumstances surrounding the creation and administration of the trust establish that the plaintiff did not create a trust for his children in good faith; that the transaction was a paper transaction contrived for the purpose of evading payment of taxes by him without parting with the control over corpus or income of the trust and that the control of the corpus and income which plaintiff retained was more than sufficient in any case to make the income from the trust taxable to him as grantor under the doctrine of Helvering v. Clifford, 1940, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

Although the taxes which plaintiff seeks to recover are only those paid on dividends of Moskin Stores, Inc. each year between 1935 and 1941, the entire administration of the trust may be reviewed in order to decide the issues raised by the Government.

The capital stock of Moskin Stores, Inc. consisted of 25,000 shares all owned by the plaintiff. On August 1, 1930, a certificate for 5,000 of these shares was issued to plaintiff's wife Irma, a certificate for 15,000 shares to the plaintiff and 5,000 shares were reserved by Moskin for issuance to executives of the company.

In an instrument dated October 1, 1930, and signed by plaintiff and his wife, it is stated:

"This will confirm our agreement with respect to the 10,000 shares of Moskin Stores Inc., stock which is held in trust for Irma Moskin and the children.

"These shares of stock are to be held in trust by Irma Moskin as Trustee, 5000 shares separately for Frances Moskin, 2500 shares separately for John Robert Moskin and 2500 shares separately for Allan Donald Moskin.

"The income is to be held by Irma Moskin in trust for Frances Moskin separately, for Allan Donald Moskin separately, and for John Robert Moskin separately.

"As Frances Moskin separately, and John Robert Moskin separately, and Allan Donald Moskin separately reach their majority (the age of 21 years) the shares of stock designated herein for each separately shall be distributed to each of them in their own full name and right, and all accumulated income.

"In the event of the death of either Frances Moskin, John Robert Moskin or Allan Donald Moskin prior to reaching the age of 21, the shares of stock and the income held in trust separately shall become the sole property of Irma Moskin, or if she is not living then to be divided amongst the surviving children.

"In the event of the death of Irma Moskin then Morris Moskin is to succeed the said Irma Moskin as Trustee hereunder and any and all other provisions of this Trust to remain as provided for herein.

"The Trustee shall have the right to dispose of all or any part of its Trust Property and the right to invest all or any part of the Trust money in any securities or property as she or he may consider proper."

The plaintiff retained possession of the 15,000 share certificate until June or July, 1931, when certificates for 5,000 shares and 10,000 shares were issued in plaintiff's name in place of the 15,000 share certificate in his name in order to provide a separate certificate for 10,000 shares mentioned in the trust agreement. Both certificates were predated August 1, 1930, the date of the 15,000 share certificate, on which there was then noted "Cancelled. Issued in error."

The plaintiff endorsed the 10,000 share certificate in his name and delivered it to Irma, who deposited it in their safe deposit box. At an unknown time, the word "trustee" was inserted after the name of Morris Moskin on this certificate.

On January 4, 1932 the following letters were exchanged by plaintiff and his wife:

"Dear Mrs. Moskin:—
"This will acknowledge that I am holding for you as Trustee for the children, 10,000 shares of Common Stock of Moskin Stores Inc., which shares of stock are their property, and which are to be delivered to each of them when they become of age:
"5,000 shares to be delivered to Frances Moskin
"2,500 " " " " " John Robert Moskin
"2,500 " " " " " Allan Donald Moskin
"I am to account to you for any dividends which may be declared on these stocks.
"Yours very truly,
"Morris Moskin"

"Dear Mr. Moskin:—
"This is to certify that you are holding as Trustee for our children, 10,000 shares of Common Stock of Moskin Stores Inc., which shares of stock are their property, and which are to be delivered to each of them when they become of age:
"5,000 shares to be delivered to Frances Moskin
"2,500 shares " " " " John Robert Moskin
"2,500 shares " " " " Allan Donald Moskin
"It is understood and agreed that you will account to me for them, for any dividends which may be declared on these stocks.
"Yours very truly,
"Irma Moskin"

On April 20, 1932, the 10,000 shares certificate and the two letters were placed in a sealed envelope and deposited in the name of the plaintiff with the Manufacturers Trust Company for safe-keeping. The envelope was returned to the plaintiff by the Trust Company on July 27, 1934.

On December 30, 1935, about three months before Frances became of age, there were issued in place of the 10,000 share certificate in Moskin's name a certificate for 5,000 shares to Frances, and a certificate for 5,000 shares to "Morris Moskin, Trustee".

When John reached his majority in 1944, a certificate for 2,500 shares was issued to him and a new certificate for 2,500 shares to "Morris Moskin, Trustee", in place of the 5,000 shares certificate. In 1946 when Allan became of age this certificate was cancelled and a certificate for 2,500 shares issued to him.

Shares referred to in the trust agreement, registered on the books of the company in plaintiff's name, were voted by him without any proxy from Mrs. Moskin.

Plaintiff ordered Schwartz, the comptroller of the corporation, to keep a record for the trust. This was done on a one-page manila folder, originally headed "Irma Moskin, Trustee—Dividend Record". The word "Irma" was crossed out later and "Morris" written in above it, notwithstanding that all entries on this record were made while Irma was still living.

Thereafter, in 1939, an internal revenue agent characterized the records as crudely kept and all entries in the folder were transcribed into the "Trust Jour-

nal", a small loose-leaf book in which there were also recorded all subsequent income and disbursements.

The manila folder discloses that in July, 1931, a dividend of $25,000 was paid to plaintiff on the 10,000 shares of trust stock. There were not any additional dividends paid on this stock until August, 1935, when a dividend of $20,000 was paid to Mrs. Moskin. One-half of these amounts, $22,500, was received on the shares held for the benefit of Frances.

The folder does not disclose any disposition of the $22,500 dividends and the Government contends that Frances never received any part thereof.

On April 22, 1936, Frances deposited in her bank account $21,500 which apparently were received by her from Mrs. Moskin. Frances in 1943 testified that she did not know whether she received any income of the trust upon her coming of age, but testified at the trial that she received the income, and that she so testifies because her memory was refreshed by her bank book, which shows the deposit on April 22, 1936. However, she was unable to recall the purpose of withdrawing $21,154 two days after the deposit was made, although this was the first time she had deposited and withdrawn such a substantial sum.

Entries disclose that dividends amounting in the aggregate to $378,750 were received on the remaining shares of Moskin Stores, Inc. in the years 1931 to 1946, as well as dividends of $600 every year for each of the sons from the Guaranty Trust Co. beginning 1931, and of $105 from the Chase National Bank beginning 1937. With the exception of the 1935 dividend which was paid to Mrs. Moskin, all Moskin Stores, Inc. dividends on the stock were paid to the plaintiff, and were deposited by him in his personal bank account and commingled with his own money on deposit.

Dividends on Guaranty Trust stock from 1936 to June, 1940 and Chase National Bank dividends from 1937 to 1940 were deposited in savings bank accounts in the name of "Irma Moskin in trust for" each son, in which there were also deposited money donated to the sons by relatives, as well as the sons' savings.

The records disclose the following payments by plaintiff for the purchase of securities: $67,375 for 100 shares Guaranty Trust Co. stock in 1931, $7,207.50 for 150 shares Chase National Bank stock in 1936, $5,000 for 50 shares of stock of the Kenmos Corporation in 1937, $15,000 each year for U. S. Savings bonds in 1938, 1939 and 1940, $110,000 for stock of Irmor Corporation in 1940.

To secure to Moskin Stores, Inc. future occupancy of store space rented by the corporation in Charleston, W. Va., the plaintiff caused the corporation to lend money to his sons, with which the property was purchased in the name of the sons. In December, 1940 the plaintiff applied $10,000 received as dividends on the trust stock as part payment of that loan. In July, 1941, plaintiff gave to the sons a statement of all income received and disbursements made by him up to December 31, 1938. The excess of income over disbursements, amounting to $12,006.08 for each son, was then distributed to each son although one was only 18 and the other 16 years of age. $15,000 of the total $24,012.16 thus distributed was used as a further payment to the Moskin Stores, Inc. for the loan. The purpose of the accounting and distribution was to provide money for this additional repayment to the corporation.

In addition to the foregoing disbursements there were paid $62,171.78 for Federal income taxes and $16,584.75 for state income taxes.

The 1931 dividend on the Moskin Stores, Inc. stock was included in the joint return of Mrs. Moskin and her husband. The 1935 dividend was received and reported by Mrs. Moskin in her individual return. In 1936 an agent of the Internal Revenue Bureau advised that fiduciary returns should be filed for the trust, and such returns were thereafter filed by Mrs. Moskin for the years 1936, 1937, 1938 and 1939. After Mrs. Moskin's death in 1940, plaintiff as succes-

sor trustee filed fiduciary returns for the trust. Taxes were paid in accordance therewith.

In 1944 and 1946, as each son became of age, the plaintiff gave to him a statement showing the income and disbursements for his trust since 1939, the date covered by the last statement, and delivered to him the Moskin Stores, Guaranty Trust and Chase Bank shares and U. S. Savings bonds. The Irmor stock was delivered to the sons at the time of its purchase.

The Government questions plaintiff's version of the facts relating to the purchase of the Irmor and Guaranty Trust Company stock.

Plaintiff testified that he bought the Guaranty Trust Company stock with his personal funds, for the trusts for his two sons, with the expectation of being repaid by income to be received for the trusts. Mr. Schwartz, a witness for the plaintiff, testified that he told plaintiff that it was not fair to give Frances twice the amount given to the boys and that this led to the purchase of the Guaranty stock for the boys so as to make the corpus of the boys' trusts and Frances' trust more equal. However, in an affidavit signed by him in 1941, Schwartz stated that the stock was bought in order to make more equal the income of the three trusts, and that the purchase price of the stock was to be repaid to plaintiff from future income of the trusts. It does not appear how inequality would be remedied by an advance which would have to be repaid. Nothing in the trust record discloses that any trust income was used to repay the plaintiff. It was only in the statements given to the sons in 1941 that the cost of the Guaranty Trust Company stock was set off against the income of the trust. Apparently the plaintiff originally treated the money advanced for the Guaranty stock as a gift to the trust, but later treated it as a loan to the trust, and reimbursed himself for the advance.

The Government further contends that the Guaranty Trust Company stock was purchased in 1935 but the purchase was recorded as having been made in 1931 in order to avoid gift taxes to which the transfer of the stock would have been subject in 1935. Schwartz' testimony discloses that he bought the 100 shares for the trust of the boys, and that the stock was bought in the name of the plaintiff. Plaintiff testified that the stock was bought originally in the boys' names and that there never was any change in the record ownership of these shares after the original purchase. The stock transfer records of the Guaranty Trust Company show that 100 shares were transferred to the sons from brokers names in September, 1935, and that there were not any purchases or transfer of stock by the plaintiff between the time of the creation of the trust and the acquisition by the sons.

Although the dividends paid by the Guaranty Trust Company were $1,000 for the years 1931 to 1933, $750 for 1934, $700 for 1935 and only $600 thereafter, the entries in the trust record show the receipt of $600 as dividends for all these years. These dividend entries for the years 1931–1935 inclusive are in a handwriting and ink different from the ink and handwriting in other entries made in those years. Mrs. Moskin included in her 1935 income tax return income received on 50 shares of Guaranty Trust Co. owned by her and income received by the trust, but did not include any income on the 100 shares of the Guaranty Trust Co. claimed to have been then owned by the trust. However, the dividends were reported for tax purposes in her fiduciary returns filed for the years following 1935.

The court finds that plaintiff has failed to prove that the Guaranty Trust Company stock was part of the trust before 1935.

The entry in the trust journal is that the Guaranty Trust Co. stock was bought in January, 1931, for the sons at $673.75 per share. At that time the asked price was less than $510. The asked price was less than $310 in September, 1935, when the shares were transferred from brokers to the sons. Thus he charged

more than the market price whether the transfer was made in 1931 or in 1935.

At a time when there were about $25,000 of accumulated uninvested income, plaintiff caused to be formed the Irmor Corporation whose sole asset was real property on Broadway. It was paid for in whole or in part with $110,000 of plaintiff's money paid by plaintiff to the corporation for common and preferred stock. The payment of the $110,000 made for the Irmor stock by plaintiff is entered in the trust journal, indicating that the purchase was for the trust. However, in the final statements given to the sons upon their coming of age, the $110,000 was treated as a loan to them individually and deducted as such from their share of the income of the trust. The Irmor stock, unlike the other securities, was turned over to the sons at the time of its purchase in 1940. There was not any testimony that the stock was bought for the trust. There is not any reason disclosed for advancing $110,000 when there were about $25,000 in the trust at the time of the purchase of the Irmor stock. On this record, the plaintiff did not establish that the money advanced for the Irmor stock was loaned to the trust and not to the sons.

Beginning with November, 1940, the plaintiff credited trust income amounting in the aggregate to $52,865 on an open account of the sons on the books of the Irmor Corporation upon which they could freely draw, although not of age.

The Government refers to the dealings with the Kenmos stock as an illustration of the manner in which plaintiff controlled trust assets. In 1937, plaintiff subscribed for 48 of the authorized 50 shares of the Kenmos Corporation whose only asset was a ninety-nine year lease, but later had all 50 shares issued in the boys' names. A note in the stock book of Kenmos states the sons paid for the stock "from their own monies", but plaintiff had the purchase entered on the manila folder as a purchase by the trust. In 1940, plaintiff allegedly doubting that this was a proper investment caused Moskin Stores to buy the stock at the original book value of $5,000 paid by the boys, although the book value of the stock had risen to $9,000. After the termination of the trusts the stock was sold to the sons again for $5,000 although the book value had advanced to over $20,000.

An examination of plaintiff's bank balances discloses that even on his own version of the dates and nature of the investments, his bank balances were less than the amount of the uninvested trust funds during long periods of time in the years 1932 to 1935, 1937 and 1938, and at one time the deficiency amounted to more than $10,000. But since the plaintiff has failed to prove that the Guaranty Trust stock was acquired before 1935, and that the money advanced by him for the Guaranty Trust and Irmor stocks were loans to the trusts, the amounts of uninvested trust funds held by him at different times in different years must be deemed to have been correspondingly higher, and the shortages in trust funds on deposit in plaintiff's bank account to have amounted to many thousands of dollars for long periods of time.

The plaintiff contends that he is not liable for any tax on the dividends because he made an absolute grant of the stock on which they were declared.

The trust agreement provides for an irrevocable long term trust. The plaintiff did not expressly retain in the trust instrument any power of control over the corpus of the trust or the income. This distinguishes this trust from those considered in the cases relied on by the defendant. The probability of reversion was so remote that it was negligible. The instrument itself does not contain any provision to justify the taxing of the income to the grantor. However, the answer to the question whether the grantor after the trust has been established may still be treated as the owner of the corpus for purposes of section 22a of the Internal Revenue Act of 1934, 26 U.S.C.A. § 22(a), depends upon an analysis of all the circumstances attendant on its creation and operation as well as on the terms of the trust. Helvering

v. Clifford, 309 U.S. 331, 335, 60 S.Ct. 554, 84 L.Ed. 788; See Helvering v. Elias, 2 Cir., 122 F.2d 171; Jones v. Norris, 10 Cir., 122 F.2d 6.

Although the plaintiff did not retain any control in the trust agreement, and named his wife, who was without any business experience, as sole trustee, he actually controlled the trust. The wife did not do anything in the administration of the trust in any manner other than that she had possession of the 10,000 share certificate for a very short time, that she received U. S. Government Savings bonds, and possibly Guaranty Trust Co. and Chase Bank stock bought in the name of the sons, that she deposited the income on the bank and trust company stock in savings accounts "in trust for" the sons, signed income tax reports for the trust, and received the 1935 dividend on Moskin Stores stock.

The plaintiff kept the Moskin Stores, Inc., stock registered in his name, in his possession and voted stock without any proxy from the trustee. He as registered stockholder, received all the dividends other than the 1935 dividend and commingled them with his own funds in his bank account. For long periods he had therein less than the uninvested income of the trust. To the extent that he drew and used trust income without any record as to its disposition, it must be assumed that he borrowed it for his personal use and benefit.

He invested the income, possibly after consulting his wife with reference thereto. Over $50,000 of the income was given by plaintiff to the Irmor Corporation and placed to the credit of the sons in their personal account on the books of Irmor Corporation on which they could draw, although they still were minors. The plaintiff offered no reason for these premature distributions made at a time when it was impossible to know who ultimately would become entitled to the corpus and accumulations thereon.

In the absence of any power in the trustee to borrow money for the trust, he advanced more than $175,000 for the purchase of securities. He used trust funds in the purchase of the Charleston property, a part of which had been rented to the Moskin Stores, Inc., of which plaintiff was president, director and stockholder, for the purpose of assuring future occupancy to Moskin Stores, Inc. As heretofore stated, he manipulated the acquisition and disposition of the Kenmos stock in a manner indicating that it was immaterial in whose name the stock was held. Thus plaintiff acted as if he were the unqualified owner of the trust property, and in a manner inconsistent with any fiduciary obligation.

Nothing in the trust instrument gave the plaintiff the power to act as he did, nor did his wife have any power to delegate almost the entire administration of the trust to him.

The instrument was drawn by Schwartz, the comptroller of Moskin Stores, Inc., who testified that in discussing the proposed creation of the trust plaintiff told him there was an understanding between plaintiff and his wife that plaintiff in his discretion could use the proceeds of the trust provided that he would be strictly accountable to the wife for the funds. The fact that he received the check for the first dividend declared on the trust stock, deposited it in his own bank account and used a large part thereof for his own purposes in the years 1932 to 1935, during which the corporation was in financial difficulties, confirms the existence of the understanding that he could use income for his own benefit, although that was to be accumulated as an integral part of the trust by the terms of the trust agreement.

██ Though a grantor may have parted with control of the corpus as well as the title, he may still be taxable on the income if he retains sufficient control over it. See Edison v. Commissioner of Internal Revenue, 8 Cir., 148 F.2d 810, 814.

The court is not convinced that he retained or exercised powers solely for the benefit of the trust and not for his own benefit.

Cushman v. Com'r of Internal Revenue, 2 Cir., 153 F.2d 510 and the Norris case, supra, relied on by the plaintiff, are distinguishable. One distinction is that in the Cushman case the court held that the powers expressly reserved by the grantor were reserved in a fiduciary capacity and therefore could not be exercised properly for his own benefit. There was no indication in that case that the settlor did anything in contravention of the terms of the trust creating any doubt that he was acting in such capacity.

In the Norris case, supra, powers were expressly reserved by the grantor for the benefit of the trust. The court found that the grantor never received any economic benefit from either corpus or income.

It has been repeatedly stated that in this class of cases each case turns upon its own particular facts, and that usually no one factor is decisive. Clifford case, supra; Jones v. Norris, supra; Miller v. Commissioner, 6 Cir., 147 F.2d 189. See Kohnstamm v. Pedrick, 2 Cir., 153 F.2d 506, 510.

■ The plaintiff has the burden of proving all the facts necessary to establish the illegality of the collection of the tax. Phillips v. Dimes Trust & Safe Deposit Co., 284 U.S. 160, 167, 52 S.Ct. 46, 76 L.Ed. 220; Niles-Bement-Pond Co. v. U. S., 281 U.S. 357, 361, 50 S.Ct. 251, 74 L.Ed. 901. He relied mainly on the trust records to prove his case. These records were crude and contain many errors. Plaintiff's testimony was frequently in conflict with other testimony given by him, with testimony given by witnesses called on his behalf and with documentary evidence. Because of the intimate family relationship between the grantor, the beneficiaries and the trustee, the court must subject the entire arrangement to special scrutiny. See Helvering v. Clifford, supra, 309 U.S. at page 335, 60 S.Ct. 554, 84 L.Ed. 788; Jones v. Norris, supra, 122 F.2d at page 10.

■ The mere signing by a taxpayer of a trust agreement, however absolute in terms, does not avoid taxation when underlying reality contradicts the absoluteness of the transfer. See White v. Fitzpatrick, 2 Cir., 193 F.2d 398. In this class of cases, "the court must look to the whole nexus of relations between the settlor, the trustee and the beneficiary, and if it concludes that in spite of their changed legal relations the three continue in fact to act and feel toward each other as they did before, the income remains the settlor's". See Helvering v. Elias, 2 Cir., 122 F.2d 171, 172.

■ To shift income tax liability the transfer must be in good faith and one by which the grantor in a family trust substantially changes his economic condition.

■ In view of the actual arrangement upon which plaintiff and his wife acted, plaintiff was assured factually although not legally that his control over the corpus and Moskin Stores, Inc. will remain unaffected by the execution of the trust, and that the income will be at his disposal whenever he needs it. At least until the termination of the trust, the transfer of the stock to the trust did not in any way diminish plaintiff's enjoyment of economic benefits from the corpus or income, and hence did not change his economic condition.

The failure to include the entire understanding between the grantor and trustee and the manner in which he disregarded the terms of the trust instrument from the very beginning leads the court to question whether it was made in good faith.

The court not being convinced that the plaintiff created the trust in good faith, and that its creation effected any substantial change in his economic condition, concludes that the plaintiff has failed to sustain his burden of proving that the tax was not properly assessed and collected.

The foregoing shall constitute findings of fact and conclusions of law unless the parties desire to propose additional findings in which event they may be submitted upon notice for consideration by the court.